**PROVIDENCE JOURNAL COMPANY**

v.

**Linda H. NEWTON, et al.**

**Stephen G. KASS, et al.**

v.

**Linda H. NEWTON, et al.**

Civ. A. Nos. 89–0146 P, 89–0148 P.

United States District Court,
D. Rhode Island.

July 14, 1989.

Joseph V. Cavanagh, Jr., Providence, R.I., for plaintiffs.

Gary Yesser and Nicholas Long, R.I. Atty. General's Office, Providence, R.I., for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

This consolidated action involves a facial challenge to the constitutionality of statutory and regulatory provisions governing the confidentiality of matters pending before the Rhode Island Ethics Commission (hereinafter "the Commission"). This matter first came before the Court on plaintiffs' motion for a temporary restraining order enjoining defendants, their agents, servants and employees, and all persons acting by, through or under them directly or indirectly, from enforcing the offending provisions. This Court having granted, and continued, the restraining order pending the filing of summary judgment motions in the case, and those motions and objection thereto having been received, I today hold that the provisions complained of constitute an unconstitutional restraint on protected speech in violation of the First and Fourteenth Amendments to the Constitution of the United States. Accordingly, plaintiffs' summary judgment motion is granted, and defendants are permanently enjoined from enforcing the confidentiality requirements at issue against complainants in proceedings before the Commission.

## I. JURISDICTION

As a preliminary matter, this Court notes in passing that plaintiffs have brought this action against the Executive Director, Chair and members of the Rhode Island Ethics Commission, in their individual and official capacities, under both the First and Fourteenth Amendments to the Constitution of the United States and the Civil Rights Act of 1871, 42 U.S.C. Secs. 1983 and 1988, and have based the Court's jurisdiction over their claim in 28 U.S.C. Secs.

1331, 1343, 2201 and 2202. On June 15, 1989, the United States Supreme Court rendered an opinion in *Will v. Michigan Dept. of State Police*, — U.S. —, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), holding that neither a State nor its officials acting in their official capacities are "persons" within the meaning of Section 1983 and noting that, as a result, Section 1983 "does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties." *Id.* at —, 109 S.Ct. at 2309. At footnote 10, however, the Supreme Court made it clear that its holding applies only to actions for retrospective relief, not to prospective actions seeking injunctive relief:

> Of course a State official in his or her official capacity, when sued for injunctive relief, would be a person under Section 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." *Kentucky v. Graham*, 473 U.S. [159] at 167, n. 14 [105 S.Ct. 3099 at 3106, n. 14 (1985)]; *Ex parte Young*, 209 U.S. 123, 159–60 [28 S.Ct. 441, 453–54, 52 L.Ed. 714] (1908).

*Id.* at —, n. 10, 109 S.Ct. at 2311 n. 10. This action, which seeks only to make permanent the temporary injunction blocking enforcement of the challenged provisions, is thus properly brought under Section 1983.

## II. UNDISPUTED FACTS

The facts of this case are simple and are not in dispute. On February 28, 1989, plaintiff Alfred Gemma filed with the Rhode Island Ethics Commission a complaint against Francis X. Flaherty, the Mayor of the City of Warwick, Rhode Island, and against the members of the Warwick City Council. Immediately thereafter, the Commission mailed to Gemma notification that it had received his complaint, together with a Notice Regarding Confidentiality that spelled out the statutory and regulatory provisions mandating confidentiality in proceedings before the Commission. Despite, however, the Commission's admonition that any disclosure of the existence or contents of the complaint would subject Gemma to criminal and civil sanctions, Gemma spoke with the media about the proscribed matter. Subsequently, on March 2, 1989, plaintiff Providence Journal Company published information about the Gemma complaint, reporting that it had been filed and setting out in some detail the allegations contained therein. On March 3, 1989, plaintiff Stephen G. Kass followed suit, commenting on the complaint and its contents.

Although no enforcement action has ever been commenced or threatened against plaintiff Gemma, the Commission, by its Executive Director, did respond to the public disclosures of information regarding Gemma's complaint by informing plaintiff Providence Journal Company of its intention to enforce the confidentiality rules against the newspaper. Accordingly, on March 7, 1989, the Providence Journal Company filed this action seeking declaratory and injunctive relief. Plaintiffs Gemma and Kass, joined by plaintiffs Steve Brown, Executive Director of the Rhode Island affiliate of the American Civil Liberties Union, Norma Kaplan, an individual who regularly speaks out on the conduct of public officials, and William McLoughlin, a Brown University professor who regularly comments on public affairs, filed a parallel suit on the same day.

On March 8, 1989, this Court entered its temporary restraining order, then extended the order on March 27, 1989 pending the filing of summary judgment motions. Before these latter submissions were received by the Court, however, the State of Rhode Island stipulated, through the Chief of the Civil Division of the Department of the Attorney General, "that the position of the defendants ... has been and remains that the statute and regulations which are the subject of the pending lawsuit have historically been and remain interpreted to cover only complainants and respondents and not third persons," and further stated that "the only matter remaining to be decided is the constitutionality of the statute and regulations as applied to plaintiff Alfred Gemma." Letter of April 7, 1989 from Nicholas Trott Long, Chief, Civil Division, Depart-

ment of the Attorney General. Accordingly, this Court is called upon today to decide only whether the State of Rhode Island may subject Alfred Gemma, the complainant in a proceeding before the Rhode Island Ethics Commission, to criminal and civil sanctions for publicly divulging information regarding his complaint when such information has been declared confidential by State statutes and regulations.

## III. THE CHALLENGED PROVISIONS

Effective June 25, 1987, the State of Rhode Island adopted Chapter 14 of Title 36 of the Rhode Island General Laws, entitled "Code of Ethics." *See generally* R.I. Gen.Laws Sec. 36–14–1, *et seq.* (1984). Styled as a code of ethics in government, the statute subjects all elected and appointed state and municipal officials, together with employees of state and local governments, boards, commissions and agencies, to its strictures. R.I.Gen.Laws Secs. 36–14–3 and 36–14–4. In general, the statute is designed to advance the policy "that public officials and employees must adhere to the highest standards of ethical conduct, respect the public trust and the rights of all persons, be open, accountable and responsive, avoid the appearance of impropriety, and not use their position for private gain or advantage." R.I.Gen.Laws Sec. 36–14–1. To implement this avowed policy, the statute proscribes an array of activities that conflict or appear to conflict with the proper discharge of official duties. R.I.Gen.Laws Sec. 36–14–5.

Section 36–14–8 of the statute commits enforcement of the Code to the Rhode Island Ethics Commission, an independent, nonpartisan body composed of fifteen (15) members appointed by the Governor. This Commission is vested with broad adminis-trative, educational, advisory, investigative, adjudicative and removal powers, including the power to investigate and adjudicate specific complaints of Code violations. R.I. Gen.Laws Secs. 36–14–9 through 36–14–14.

Among the particular prohibitions enumerated in Section 36–14–5 of the Code are provisions designed to ensure the confidentiality of proceedings before the Ethics Commission. Specifically the statutes provides:

No person shall knowingly and wilfully make public any complaint or the content of any complaint filed under this chapter without the consent of the person aginst whom the complaint has been filed, unless and until an adjudicative panel of the commission renders a final decision on the complaint following (i) a probable-cause finding by an investigating committee of the commission, pursuant to Section 36–14–12(d)(4) of this chapter and (ii) the conduct of an adjudicative hearing pursuant to Section 36–14–13 of this chapter.

R.I.Gen.Laws Sec. 36–14–5(*l*).[1] This confidentiality requirement is further explicated in the implementing rules and regulations to the Code of Ethics, as amended,[2] which state:

*Regulation 36–14–5004 Written waiver requirements*

Consent or other waiver of confidentiality permitted under any provision of this chapter or these regulations shall not be valid unless a written waiver of confidentiality, on a form provided by the commission, is signed and filed by the respondent.

*Regulation 36–14–5005 Public forum exceptions* [3]

The prohibitions contained in this Chapter and regulations thereto shall not

1. The confidentiality requirements of Section 36–14–5(*l*) are essentially reiterated in Section 36–14–12(b) which provides that "Any ... complaint filed with the commission ... shall be confidential unless respondent requests otherwise, in which case it shall be a public record."

2. Regulations 36–14–5004, 36–14–5005 and 36–14–5006 were newly adopted by the Ethics Commission on December 15, 1988 and January 26, 1989, were filed with the Secretary of State on February 16, 1989 and were to have become effective on March 8, 1989. Before their implementation, however, these regulations were enjoined by this Court and have thus never been enforced against either a third party or a participant in a proceeding before the Commission.

3. *See also* Regulation 36–14–8001 which reiterates the public forum exceptions for members and employees of the Commission.

be construed to limit or prevent any person subject to this Chapter from publicly expressing his or her own view points [sic] in a public forum on any matter of general public interest or on any matter which directly affects said individual or his or her spouse or dependent child.

*Regulation 36–14–5006 Definition— "make public"*

The term "make public" as used herein shall mean and include any unauthorized disclosure under the law and shall be and is meant to prohibit any public discussion of a complaint even if prior unauthorized disclosure has been made.

Taken together, Section 36–14–5(*l* ) of the Code of Ethics and its implementing regulations serve to black out, prior to a final adjudication on the merits, all public discussion of the existence or contents of a complaint filed with the Ethics Commission,[4] unless the party charged with the violation formally consents in writing to such discussion and even if the proscribed information has otherwise been publicly disclosed. Further, these provisions are but one element of a larger scheme of confidentiality

requirements designed, in the main, to protect innocent respondents from premature disclosure of unfounded accusations of ethics violations. Thus, for example, Sections 36–14–12(d)(1) [5] and 36–14–12(d)(3) [6] provide that complaints dismissed as lacking at the complaint or preliminary investigation stage must ever after remain confidential, while Section 36–14–13(g) [7] and Regulation 36–14–13011(1) [8] provide in contrast that complaints that proceed to final decision, together with the record of proceedings upon which final decision is based, are to become a matter of public record except in those cases referred to the attorney general.[9] In addition, Section 36–14–13(d)(5) [10] closes the adjudicative hearings of the Commission to the public.

Finally, the statute provides for both civil and criminal penalties for violations of its confidentiality provisions. Section 36–14–13(e), for example, empowers an adjudicative panel of the Commission, upon a finding that there has been a violation of the Code, to impose any of an array of sanctions, among them civil penalties of not more than $10,000 per violation. In addition, Section 36–14–19 provides that:

> within thirty (30) days after said final decision is rendered."

---

**4.** As noted above, the parties to the instant action agree that the provisions at issue are inapplicable to strangers to the proceedings.

**5.** Section 36–14–12(d)(1) provides: "If the investigating committee determines that the verified complaint does not allege facts sufficient to constitute a knowing and wilful violation of any of the provisions of this chapter, it shall dismiss the complaint and notify the complainant and the respondent of such dismissal. The contents and substance of any complaint so dismissed shall thereafter remain confidential."

**6.** Section 36–14–12(d)(3) provides: "If the investigating committee finds after its preliminary investigation that probable cause does not exist to support the allegations of the complaint, the commission shall dismiss the complaint and notify the complainant and the respondent of such dismissal. The contents and substance of any complaint so dismissed shall thereafter remain confidential."

**7.** Section 36–14–13(g) states: "Except in those cases referred to the attorney general . . . a final decision of an adjudicatory panel of the commission and record of proceedings before the commission upon which said final decision is based shall be made public by the commission

**8.** Regulation 36–14–13011(1) states: "A complaint, including the names of complainant and respondent, and commission official file relating to the complaint shall be confidential and available only to the commission, the commission staff . . . the complainant, respondent and their attorneys until a final decision has been rendered by the commission and has become a public record in accordance with these regulations. The decision and record of the proceedings shall become a public record on the fifteenth (15th) day after mailing of the decision to the respondent."

**9.** Regulation 36–14–5001 further explicates the Commission's policies regarding public access to its records.

**10.** Section 36–14–13(d)(5) provides: "At any adjudicative hearing conducted by an adjudicative panel of the commission the hearing shall be closed to the public unless the respondent requests otherwise, in which case it shall be open; and, in the absence of such a request by the respondent, the content and substance of all proceedings before the adjudicative panel shall remain confidential except as provided. . . ."

Any person who knowingly and wilfully violates the provisions of this chapter shall, in addition to the civil penalties provided herein, be guilty of a misdemeanor punishable by a fine of not more than one thousand dollars ($1,000) and/or imprisonment for no longer than one (1) year.

It is the confidentiality provisions of the Code of Ethics, specifically R.I.Gen.Laws Sec. 36–14–5 and Regulations 36–14–5004, 36–14–5005 and 36–14–5006, that plaintiff Gemma challenges as imposing unconstitutional restraints on his right to express himself in a public forum about matters of public interest in contravention of the First Amendment of the Constitution.

## IV. THE CONSTITUTIONAL STANDARD

### A. *Protected Speech*

■ This Court has no hesitation in first finding that the speech at issue in this case, namely public discussion of the existence and substance of an ethics complaint formally filed under oath against a public official,[11] is speech protected by the First Amendment of the Constitution. Supreme Court precedent has, of course, been unwaivering in its adherence to the bedrock principles that expression on public issues rests "on the highest rung of the hierarchy of First Amendment values," *Carey v. Brown*, 447 U.S. 455, 467, 100 S.Ct. 2286, 2293, 65 L.Ed.2d 263 (1979), and thus that "debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). *See also Mills v. Alabama*, 384 U.S. 214, 218, 86 S.Ct. 1434, 1437, 16 L.Ed.2d 484 (1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.") In the context of

this general proposition that freedom of expression about public affairs is sacred under the First Amendment, the Supreme Court has further made it clear that protected political speech goes far beyond abstract, intellectual argument about political theory to include vigorous debate about the qualifications and official conduct of public officials. *See, e.g., New York Times Co. v. Sullivan*, 376 U.S. at 268, 84 S.Ct. at 719–20, citing with approval *Beauharnais v. Illinois*, 343 U.S. 250, 263–64, 72 S.Ct. 725, 734, 96 L.Ed. 919 (1952) ("public men, are, as it were, public property" and "discussion cannot be denied and the right, as well as the duty, of criticism must not be stifled"). *Cf. N.A.A.C.P. v. Button*, 371 U.S. 415, 429, 83 S.Ct. 328, 336, 9 L.Ed.2d 405 (1962) (First Amendment protects "vigorous advocacy" no less than "abstract discussion"). Further, it is settled that open discussion of official conduct is accorded the broadest protection available in our political system notwithstanding the fact "that it may well include vehement, caustic and sometimes unpleasantly sharp attacks on government and public officials." *New York Times Co. v. Sullivan*, 376 U.S. at 270, 84 S.Ct. at 721. Indeed so sweeping is the protection accorded the citizen-critic of official conduct that a public official falsely maligned is barred from recovering damages for libel absent proof of actual malice, *id.,* 376 U.S. at 283, 84 S.Ct. at 727–28, on the theory that even erroneous political expression must be protected if freedom of speech is to have the "breathing space" that it needs to survive. *N.A.A.C.P. v. Button*, 371 U.S. at 433, 83 S.Ct. at 338.

Analyzed against this doctrinal backdrop, there can be no doubt that the First Amendment protection of expression on public issues encompasses citizens' complaints that public officials, be they elected, appointed or employed, have breached contemporary canons of ethics in government.[12] Indeed this view is implicit in the

11. Regulation 36–14–12002 spells out the requirements for filing a complaint with the Rhode Island Ethics Commission.

12. This Court notes in passing that this case does not involve the question of how much

protection is afforded under the First Amendment to public discussion of public officials' private affairs. The list of prohibited activities set out in Section 36–14–5 of the Code of Ethics all clearly involve matters impinging on the

Supreme Court's analysis in *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 838–39, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), in which the Court concluded that speech and publication regarding confidential proceedings of the Commonwealth of Virginia's Judicial Inquiry and Review Commission, a body established to oversee the operation of the courts and the judicial conduct of judges, "lies near the core of the First Amendment." Surely if public discussion of the courts and of the conduct of judges "are matters of utmost public concern," discussion of which "the First Amendment was adopted to protect," how much closer to the First Amendment's core must lie speech about the conduct of officials in the legislative and executive branches of government, which conduct our electoral system of government routinely and deliberately subjects to intensive public scrutiny and criticism as the principle means of ensuring the accountability of the governors to the governed. This Court thus concludes that speech by a citizen charging government officials with breach of a legislatively sanctioned code of official conduct is political speech accorded the greatest protection available under the First Amendment.

Finally, this Court notes that defendants' attempt to, in effect, carve out a category of lesser protected speech, by arguing that the statute at issue here blocks only a citizen's right to divulge the existence of a formally filed complaint or to describe its content without interfering with the right to discuss the facts which form the basis of the complaint, is conceptually indefensible. Defendants' Objection to Plaintiffs' Motion for Summary Judgment (hereinafter "D. Objection"), p. 5. This Court sees no principled way to distinguish the substance of an ethics complaint from the facts underlying it or to distinguish speech about such a complaint from general public criticism of the accused official. In sum, public accusations of unethical conduct by governmental

figures lies at the very core of the First Amendment to the United States Constitution, and the degree of protection accorded such speech is not diminished simply because it is articulated first in the form of formal charges of misconduct. To hold otherwise would be to condition a citizen's right to publicly criticize official conduct on his foreswearing recourse to legislatively authorized channels for investigating such breaches of public trust, a requirement which fundamentally contradicts the First Amendment raison d'etre of assuring "unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1956). Accordingly, this Court must analyze the State's statutory scheme as an infringement on protected political speech.

## B. *Nature of the Restriction*

It is, of course, well settled that the categorization of speech as protected does not ipso facto immunize it from all government regulation, even though it be "core speech" lying at the very heart of the First Amendment. As Mr. Justice Brandeis said in summarizing Supreme Court dogma regarding the scope of First Amendment rights:

> The right to free speech, the right to teach and the right of assembly are, of course, fundamental rights. (Citations omitted.) These may not be denied or abridged. But, although the rights of free speech and assembly are fundamental, they are not in their nature absolute. Their exercise is subject to restriction, if the particular restriction is required in order to protect the State from destruction or serious injury, political, economic or moral.

*Whitney v. California*, 274 U.S. 357, 373, 47 S.Ct. 641, 647, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring). To restrict "core speech" based on its content,[13] how-

---

performance of official duties, and debate on such matters is clearly encompassed within the notion of "public affairs" articulated in Supreme Court precedent.

**13.** A content-based regulation restricts speech precisely because of the ideas or information that the speech contains or because of its general subject matter. Because such content discrimination so fundamentally contradicts the

ever, the government is required to show that the regulation in question is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end, utilizing the least-restrictive means possible. *See, e.g., Carey v. Brown,* 447 U.S. 455, 461, 100 S.Ct. 2286, 2290, 65 L.Ed.2d 263 (1980). If, on the other hand, the restriction can be fairly categorized as content neutral,[14] then it is subjected to some lesser decree of judicial scrutiny which varies with the characterization of the forum in which the speech is uttered as public, limited public created by government designation or private. *See generally Perry Educ. Assn. v. Perry Local Educators' Assn.,* 460 U.S. 37, 45-46, 103 S.Ct. 948, 954-55, 74 L.Ed.2d 794 (1983). More specifically, if, as in this case, the forum to which the state is attempting to restrict access is a traditional public forum, which "by long tradition or by government fiat have long been devoted to assembly or debate," *Perry,* 460 U.S. at 45, 103 S.Ct. at 954, then, under the test recently reformulated in *Ward v. Rock Against Racism,* — U.S. ——, ——, 109 S.Ct. 2746, 2757-59, 105 L.Ed.2d 661 (1989), the government must show that the regulation in question has been narrowly tailored to serve a significant state interest, but need not demonstrate that it is the least-restrictive means of achieving the state's end. "Rather the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' "

In the case at bar, each party to the dispute has attempted to gloss the facts so as to heighten or lessen the decree of scrutiny employed by this Court in evaluating the validity of the challenged statutory and regulatory provisions. For his part, plain-

tiff Gemma has cast the offending provisions as, while "not technically ... a classic prior restraint, ... as close as one can get." Plaintiffs' Memorandum of Points and Authorities in Support of Their Motion for a Temporary Restraining Order (hereinafter "P.Memo."), p. 8. The advantage to plaintiff of characterizing Rhode Island's regulatory scheme as a system of prior restraints is, of course, that such an interference with freedom of expression "comes to this Court bearing a heavy presumption against its constitutional validity," *see, e.g., Southeastern Promotions, Ltd. v. Conrad,* 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1975), subjecting it to a degree of protection so broad that it avoids constitutional infirmity only if it fits within one of a handful of narrowly defined exceptions, *see Near v. Minnesota,* 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931) (immunity from prior restraint has been recognized only in exceptional cases, among them to protect the national security, to prevent the publication of obscenity, and to protect against incitement to acts of violence and the overthrow by force of orderly government), and only if it has been accomplished "under procedural safeguards designed to obviate the dangers of a censorship system." *Freedman v. Maryland,* 380 U.S. 51, 58, 85 S.Ct. 734, 739, 13 L.Ed.2d 649 (1965).

The defendants, on the other hand, repeatedly intimate that the provisions at issue constitute nothing more than a reasonable time restriction on plaintiff's speech, arguing that the State seeks to curtail discussion of the existence and specific content of the complaint "only until such time as it has had an opportunity to investigate and consider the complaint." In defendants view, the "de minimus" impact on First Amendment rights imposed by this

---

principles underlying the First Amendment, content-based regulations are subjected to the strictest scrutiny utilized by federal courts to analyze the legitimacy of governmental interference with speech. *See Police Dept v. Mosley,* 408 U.S. 92, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) ("[Above] all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.")

**14.** A content-neutral regulation involves an incidental interference with speech merely as a byproduct of the government's effort to regulate some evil unconnected with the content of the affected speech. In general, a reasonable time, place or manner regulation of protected speech, crafted to serve the government's legitimate content-neutral interests, is valid under the First Amendment. *Ward,* — U.S. at ——, 109 S.Ct. at 2757-59.

"brief and limited ban on disclosure" is easily justified by "several discrete legitimate interests" in confidentiality that the State advances. *See generally* D. Objection.

The parties' arguments notwithstanding, this Court thinks it obvious that the statutory and regulatory provisions at issue in the case at bar are prototypical content-based regulations of protected speech. In *Landmark*, the Supreme Court found that regulations criminalizing the divulging of information regarding proceedings before a state judicial review commission authorized to hear complaints of judicial disability and misconduct did not constitute a prior restraint, apparently approving the reasoning of the Supreme Court of Virginia that the absence of an injunction flatly prohibiting speech, or of a licensing or permit requirement, or of a system of censorship or previous review sufficiently distinguished the Commonwealth's regulatory scheme from classic cases of prior restraint and consigned it instead to the category of "subsequent punishment." Although the line, never distinct, between "prior restraints" and "subsequent punishments" has blurred even further since the *Landmark* case was decided, at least with regard to state action to punish the publication of truthful information by the press, *see, e.g., Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 101–02, 99 S.Ct. 2667, 2669–70, 61 L.Ed.2d 399 (1979) (whether viewed as a prior restraint or as a penal sanction, statute forbidding publication of alleged juvenile delinquent's name requires the highest form of state interest to sustain its validity), this Court nevertheless thinks it clear that, although the threat of sanctions wielded by the State in this case may chill plaintiff's speech, it does not in principle, and did not in practice, operate to freeze his speech before he publicly aired his message. *See In the Matter of Providence Journal Co.*, 820 F.2d 1342, 1345–46 (1st Cir.1986) ("Al-

though the threat of damages or criminal action may chill speech, a prior restraint 'freezes' speech before the audience has the opportunity to hear the message."). Seeing no substantive difference between the regulations at issue in *Landmark* and those at issue here, and being satisfied that Gemma has available, and is availing himself of, "a full hearing with all the attendant procedural protections" prior to the imposition of sanctions in his case, this Court eschews prior restraint analysis of the Commission's confidentiality scheme. *In the Matter of Providence Journal Co.*, 820 F.2d at 1346.

Similarly, in arguing that the Ethics Commission's confidentiality scheme only impedes a little speech for a little while, defendant hastens over the crucial fact that it is the very content of the complaint that is initially banned from public discussion, and fails to mention altogether that those complaints found lacking in "not alleg[ing] facts sufficient to constitute a knowing and wilful violation" of the Code of Ethics or not supported by a finding of "probable cause" at the preliminary investigation stage are never to see the light of day. Clearly such regulations are not only content-based in the purest sense of the word, banning speech precisely because it contains specific allegations of official misconduct, but also attempt to apply a test of truth to the public airing of grievances by citizen-critics, a test which has no place whatsoever in First Amendment jurisprudence. As the Supreme Court said in *Button*, 371 U.S. at 445, 83 S.Ct. at 344, the constitutional protection of speech does not turn upon "the truth, popularity or social utility of the ideas and beliefs which are offered." Nor does the State's attempt to carve out the so-called "public forum exceptions" rescue the regulations from the status of content-based restrictions on protected speech. Regardless of what the statute attempts to allow, it nonetheless disallows speech that is clearly protected.[15]

---

15. This Court also notes that federal courts have long rejected the Commission's argument that a government imposed postponement of speech constitutes merely an "incidental" restriction that does not run afoul of the First Amendment.

*See, e.g., Bridges v. State of California,* 314 U.S. 252, 269, 62 S.Ct. 190, 197, 86 L.Ed. 192 (1941) (that a restriction on freedom of expression is an unfocussed threat, limited in time, does not change its censorial quality); *Worrell Newspa-*

Accordingly, for the reasons cited above, this Court will subject the challenged provisions to the strictest scrutiny.

C. *The Test of Confidentiality Requirements Surrounding Administrative Proceedings to Investigate Alleged Official Misconduct*

In *Landmark*, 435 U.S. at 829, 98 S.Ct. at 1535, the Supreme Court confronted the narrow question of "whether the First Amendment permits the criminal punishment of third persons who are strangers to the inquiry, including the news media, for divulging or publishing truthful information regarding confidential proceedings" of a Judicial Inquiry and Review Commission established by the Commonwealth of Virginia to investigate charges of judicial misconduct. Noting the analogy between the case at bar and cases addressing the power of the state to punish out-of-court comments concerning pending grand jury investigations or trials, the Supreme Court adopted a variant of the clear-and-present-danger branch of the strict scrutiny test of content-based regulations of protected speech. Specifically, the *Landmark* Court, citing *Bridges v. California*, 314 U.S. 252, 263, 62 S.Ct. 190, 86 L.Ed. 192 (1941), *Pennekamp v. Florida*, 328 U.S. 331, 347, 66 S.Ct. 1029, 90 L.Ed. 1295 (1946), *Craig v. Harney*, 331 U.S. 367, 376, 67 S.Ct. 1249, 91 L.Ed. 1546 (1947) and *Wood v. Georgia*, 370 U.S. 375, 82 S.Ct. 1364, 8 L.Ed.2d 569 (1962), said:

> What emerges from these cases is the "working principle that the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished," ... and that a "solidity of evidence" ... is necessary to make the requisite showing of imminence. "The danger must not be remote or even probable; it must immediately imperil."

In the case at bar, unlike *Landmark*, this Court is concerned not with the power of the state to regulate publication by the press of information gleaned from on-going, confidential proceedings, but rather with the power of the state to regulate public expression by a citizen-critic of official conduct made apart from, even prior to, the initiation of an investigative or adjudicative hearing and based solely on his own information and belief. Surely if government infringement on the First Amendment right of third parties to speak about confidential proceedings is deserving of such strict scrutiny, it seems self-evident to this Court that government infringement on the First Amendment right of citizens personally aggrieved to speak publicly about their grievances is deserving of equally strict scrutiny.

■ Justification for extending the pending grand jury investigation or trial analogy upon which the Supreme Court relied in *Landmark* to the facts and circumstances of this particular case is found upon close examination of *Wood*, the only one of the four cases cited in *Landmark* to involve out-of-court statements made by a private person, not the press, about pending court proceedings. In *Wood*, the Court was faced with deciding "the scope of the constitutional protection to be enjoyed by persons when the publication of their thoughts and opinions is alleged to be in conflict with the fair administration of justice in state courts." Wood, an elected sheriff and announced candidate for reelection, issued to the press and distributed as An Open Letter to the ... Grand Jury a written statement vigorously criticizing the action taken by a local judge in charging a sitting grand jury to conduct an investigation of a "an inane and inexplicable pattern of Negro bloc voting" in the locality and expressing his personal views on the subject matter of the investigation. In holding Wood's out-of-court utterances to be protected by the First Amendment, the Court said:

> Men are entitled to speak as they please on matters vital to them; errors in judgment or unsubstantiated opinions may be exposed, of course, but not through punishment for contempt for the expression. Under our system of government, counterargument and education are the weapons available to expose these mat-

*pers of Indiana, Inc. v. Westhafer*, 739 F.2d 1219, 1224 (7th Cir.1984).

ters, not abridgment of the rights of free speech and assembly....Hence, in the absence of some other showing of a substantive evil actually designed to impede the course of justice in justification of the exercise of the contempt power to silence the petitioner, his utterances are entitled to be protected.

*Wood v. Georgia,* 370 U.S. at 389, 82 S.Ct. at 1372. In short, *Wood* stands for the highly relevant proposition that, in the absence of a showing of "actual interference" with the fair administration of justice, an individual is empowered by the First Amendment to comment publicly on the precise matter that is the subject of a pending investigatory proceeding, and further that that right is in no way diminished by the fact that the speaker possesses a personal stake in the outcome of the proceeding or that his pronouncements are later found to be in error.

▉ A similar result was recently reached by the First Circuit Court of Appeals in the context of a pending administrative law proceeding. In *In re Perry,* 859 F.2d 1043 (1st Cir.1988), an administrative law judge ("ALJ") for the Occupational Health and Safety Administration ("OSHA") issued a protective order during an OSHA proceeding stating that "all information developed through this proceeding shall be used only to resolve the issues herein" and further stating that any abuse of the order "may terminate a party's right to participate." When union officials subsequently made out-of-hearing statements criticizing the judge and what was taking place in the hearings, the union's representative to the proceedings was excluded. In concluding that OSHA had advanced no interest compelling enough to justify the Commission's "naked attempt" to control the union's out-of-hearing statements, the First Circuit adopted the reasoning of *Bridges* and progeny that a trial judge's concerns that public statements would adversely affect pending proceedings failed to provide adequate justification for restricting the parties' freedom of speech. Again the parallels with the case at bar are clear: parties to a pending administrative adjudicatory hearing cannot be silenced

from commenting publicly on those proceedings, absent a showing of actual adverse impact on the compelling interests advanced by the government to justify the restriction.

In sum, with such clearly analogous precedent to draw on, this Court adopts the formulation of the strict scrutiny test articulated in *Landmark* to evaluate the Ethics Commission's attempt to punish complainant Gemma for divulging the existence and content of his ethics complaint against the Mayor and members of the City Council of Warwick, Rhode Island, in violation of state statutes declaring such information confidential.

## V. ANALYSIS

▉ In their Objection to Plaintiff's Motion for Summary Judgment, defendants advance seven interests which they argue are compelling enough to justify the challenged confidentiality requirements:

1. to prevent a complainant with self-serving motives from publicly discussing an unfounded complaint until the Commission has had an opportunity to rule thereon;

2. to minimize the injury to the reputation of a public official caused by adverse publicity from unfounded complaints;

3. to maintain the public's confidence in its elected officials by preventing the premature disclosure of unfounded complaints;

4. to protect the complainants and witnesses from possible recrimination;

5. to facilitate the investigation of the complaint;

6. to prevent the use of a state agency to injure the reputation of another person; and

7. to prevent a complainant from enhancing the veracity and credibility of his complaint by invoking the name of the ethics commission.

D. Objection, pp. 5–6. In general, defendants argue, the bedrock interest undergirding the State's several concerns is that

of ensuring fundamental fairness to the accused. In defendants' words:

> The state wishes to avoid the use of its Ethics Commission as a weapon and a means of gaining publicity for groundless or personal grievances. In the absence of any finding of probable cause it is inherently unfair to subject a respondent to publicity regarding a complaint, as the fact of the pendency of the complaint before a state commission gives credibility to the facts claimed that they would not have if merely stated by the complainant.

D. Objection, p. 7. Such fairness, defendants reason, can best be guaranteed by preventing public discussion of ethics complaints prior to any consideration of their merits.

This Court does not question that requiring confidentiality regarding Ethics Commission proceedings serves legitimate interests of the State of Rhode Island. Nor is this Court blind to the costs associated with allowing free and open discussion of our political affairs. But the First Amendment, as Judge Learned Hand eloquently explained, "presupposes that right conclusions are more likely to be gathered out of a multitude of tongues, than through any kind of authoritative selection. To many this is, and always will be, folly; but we have staked upon it our all." *United States v. Associated Press*, 52 F.Supp. 362, 372 (D.C.S.D.N.Y.1943). The question is thus not whether the State's concerns are legitimate, but whether they are compelling enough to silence a citizen-critic of official conduct through the imposition of civil and criminal sanctions. Supreme Court precedent makes it very clear that the answer to this question must be a resounding no.

Much of what defendants articulate as justification for the challenged confidentiality requirements constitutes a dual concern for protecting the reputation of public officials and for maintaining the institutional integrity of the political process. Injury to official reputation has repeatedly been found by the Supreme Court to be insuffi-cient reason for suppressing political speech. As the Court said in *New York Times Co. v. Sullivan*, 376 U.S. at 273, 84 S.Ct. at 722, "Criticism of ... official conduct does not lose its constitutional protection merely because it is effective criticism and hence diminishes ... official reputation." In a related vein, it is a fundamental assumption of our system of government that the public's confidence in its elected officials is best maintained not by shielding them from public criticism but by welcoming it. Mistrust of government, we believe, grows more from enforced silence, with its potential for breeding "resentment, suspicion and contempt," *Bridges*, 314 U.S. at 270–71, 62 S.Ct. at 197, than from freewheeling discussion and debate, however "premature." In this context, it is simply not for the government to attempt to shield public officials from whatever self-serving motives the electorate may have in speaking out on public affairs, nor to shield critics of the government from the reputational consequences of their actions. It is in the nature of our system of government that participation in the political process involves all who join in in the hurly-burly of unfettered exchange, charge and counter-charge, point and counter-point. While this Court agrees that much damage can be done when "sensitive" topics are addressed in such an adversarial way, it is simply anathema in our political system for the government to attempt to define what is too "sensitive" for public discussion. Rather than allow the government to engage in such a line-drawing exercise, which common sense teaches is doomed to partisan manipulation, we have never, in over 200 years of democratic self-governance, allowed to begin the process of circumscribing political speech in order to soften the personal or political consequences of the debate. This Court sees no state interest that would justify taking such a step today in the context of discussion of official misconduct, the quintessential example of the kind of speech that the First Amendment was created to protect.[16]

---

**16.** In this context I also note that the defendants are not justified in attempting to equate protect-

In addition, however, defendants evidence a further concern that, recent federal court decisions suggest, may be entitled to more weight in the balance, that of preventing manipulation of a state-created investigatory process. In *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), for example, the Supreme Court showed heightened solicitude for the judiciary's concern that information obtained through pretrial discovery but not relevant to the case at bar not be abused through subsequent public dissemination by litigants. In ruling that a litigant has no First Amendment right to publicly release information originally made available only for purposes of trying his suit, the Court gave great weight to the courts' "substantial interest in preventing ... abuse of its processes." Central to the Court's reasoning was its concern that "discovery may seriously implicate privacy interests of litigants and third parties," and its belief that information obtained through court-ordered pretrial discovery should not subsequently be used to wreck incidental havoc with such persons' lives or reputations. *See also Anderson v. Cryovac, Inc.*, 805 F.2d 1 (1st Cir.1986) (district court faced with specific instances of massive and potentially harmful publicity resulting from public disclosure of deposition contents possessed requisite good cause for issuing protective order blocking dissemination of such information). *See also Greer v. Spock*, 424 U.S. 828, 96 S.Ct. 1211, 47 L.Ed.2d 505 (1976) (no generalized constitutional right to make political speeches, demonstrate or leaflet on military reservation where such dissemination of information inconsistent with the American constitutional tradition of a politically neutral military establishment).

While superficially appealing, this Court finds the reasoning of *Rhinehart* inapposite to the case at bar. The *Rhinehart* Court was faced with the question of whether the First Amendment protects the right of a litigant in a pending civil action "to disseminate information that he has obtained pursuant to a court order that both granted him access to that information and placed restraints on the way in which the information might be used." *Rhinehart*, 467 U.S. at 32, 104 S.Ct. at 2207, 81 L.Ed.2d 17. In the case at bar, however, the complainant is not arguing that he has a First Amendment right to reveal information that he has obtained by availing himself of state-created investigatory processes not traditionally accessible to the public as a matter of right. *Gannett v. DePasquale*, 443 U.S. 368, 389, 99 S.Ct. 2898, 2910, 61 L.Ed.2d 608 (1979). Indeed, Gemma states to the contrary that he is not challenging the State's right to impose confidentiality requirements on ongoing Ethics Commission hearings, at least to the extent of restricting participants' from speaking publicly about information gleaned from those proceedings. P. Memo., pp. 8–9. Instead the nugget of Gemma's position is that the State may not, by encasing information traditionally protected by the First Amendment in a formal mechanism for investigating the veracity of that information, create a zone of confidentiality which can only be breached with the permission of the speaker's protagonist or upon the State's resolution of the issues in question. The Court quite agrees. This is not a case of a litigant seeking to publicize information to which he had no right of access in the first place by utilizing a state-created agency to ends not within the scope of its original mandate; this is a case of a citizen seeking to exercise his constitutional rights to criticize public officials, specifically and pointedly, and to petition his government for redress of his grievances, be they real or imagined. As such, Gemma's case falls squarely within the four corners of the First Amendment. *See also Thomas v. Collins*, 323 U.S. 516, 530, 65 S.Ct. 315, 89 L.Ed. 430 (1945) ("It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guarantee with the rights of the people peaceably to assemble and to petition for redress of grievances. All these,

---

ing the official reputation of public officials with ensuring "fundamental ... fairness to the accused." The latter concept, drawn from criminal law, cannot fairly be analogized to accusations of official misconduct lodged against public officials.

though not identical, are inseparable. They are cognate rights."). In our constitutional system, the government simply cannot condition a citizen's right to challenge public officials' performance of their duties on his silence. To do so is the essence of unconstitutional censorship. To the extent that the Ethics Commission has a responsibility to prevent abuse of its own processes, it can do so by, as the *Landmark* Court suggested, creating "careful internal procedures to protect the confidentiality of Commission proceedings." 435 U.S. at 829, 98 S.Ct. at 1535.[17]

Finally, with regard to defendants' concern that public discussion will hamper the Commission's ability to carry out its investigation, this Court can only point out that public discussion of ethics in government, in general and in specific, will arguably facilitate the purposes of the Commission much more than the Commission's current, contradictory attempt to air such issues in secret.

In sum, defendants have not advanced any interests sufficient to justify the attempted restriction of protected speech. In addition, even had the Commission advanced compelling state interests for its confidentiality requirements, this Court notes that defendants have merely asserted, without substantiating in any way, that allowing Gemma to speak about his complaint will bring about the evils that defendants fear. However, as the *Landmark* Court made clear, there must be a "solidity of evidence" that the danger posed by Gemma's speech is be "clear and present" and this showing has simply not been made by defendants. Official speculation and anxiety about the dangers of protected speech can never serve to justify its censorship by the state. In the absence of a compelling state interest immediately imperiled by Gemma's speech, this Court hereby grants plaintiff Gemma's motion for summary judgment. Because this case has been disposed of on these grounds, this

Court need not reach plaintiff's additional overbreadth and vagueness challenges to the confidentiality provisions.

So ordered.

17. This Court notes in passing, however, that, while administrative proceedings, unlike criminal and civil trials, do not have a long history of openness, the Third Circuit has nonetheless held that the Commonwealth of Pennsylvania's confidentiality requirements for its Judicial Inquiry & Review Board may not constitutionally sweep within their ambit a witness's own testimony. *First Amendment Coal. v. Judicial Inquiry & Review Board,* 784 F.2d 467 (3d Cir.1986).