**Theodore KAMASINSKI**

**v.**

**JUDICIAL REVIEW COUNCIL, et al.**

**Civ. No. 2:91–127 (JAC).**

United States District Court,
D. Connecticut.

March 31, 1992.

As Amended on Motion to
Clarify April 21, 1992.

Theodore Kamasinski, pro se.

Henry S. Cohn, Carolyn K. Querijero, Office of the Atty. Gen., Hartford, Conn., for defendants.

Martin B. Margulies, University of Bridgeport School of Law, Bridgeport, Conn., Philip D. Tegeler, Connecticut Civil Liberties Union Foundation, Hartford, Conn., for Connecticut Civil Liberties Union Foundation, amicus curiae.

## RULING ON MOTION TO DISMISS

### JOSÉ A. CABRANES, District Judge:

This case is about the judicial process and preserving the integrity of that process. The justice system and society itself require protection from the occasional intemperance, infirmity, incompetence, or, in rare cases, venality of a judge. But devising a means to achieve that goal while safeguarding the independence of the judiciary has been far from easy. On the one hand, policing the judiciary in public proceedings creates a forum in which disgruntled and irresponsible litigants may pursue personal vendettas by libelling or harassing judges who have ruled against them. The threat of retaliatory attacks endangers not only the reputations of individual judges, but also the ability of all judges to act with the firmness and fearlessness that is indispensable to an independent judiciary. What is more, it is doubtful that a state could conduct a viable process of reviewing alleged judicial misconduct if all proceedings or investigations were at all times subject to public disclosure. On the other hand, completely confidential review of judicial conduct by judicial colleagues—colleagues whose expert knowledge is, of course, indispensable to the review process—arguably invites the popular perception of a clubby indifference to public concerns. Procedures for review of judicial

conduct must therefore seek to minimize these tensions. As is the case with all governmental measures, these procedures must, among other things, comply with the dictates of the United States Constitution.

\*　　\*　　\*　　\*　　\*　　\*

Plaintiff Theodore Kamasinski ("Kamasinski") brings this case as a facial constitutional challenge to the validity of a Connecticut statute making confidential certain proceedings, investigations, and other activities of the defendant Judicial Review Council ("JRC"). Defendants include the JRC itself, its executive director, and eleven of its members, who are sued in their official capacities only.[1] Plaintiff, a former Connecticut resident who now resides in New Hampshire, has filed at least one complaint against a Connecticut judge with the JRC and "intends to file additional charges against other Connecticut judges." Complaint ¶ 1.

In his complaint, plaintiff states that he "desires to obtain, disclose and discuss information regarding the charges he filed with [the JRC] and to learn [the JRC's] findings and conclusions, and the facts uncovered during the investigations." Complaint ¶ 16. The complaint also alleges plaintiff's desire "to obtain, disclose, publish and discuss information regarding the charges others have filed with [the JRC] and to learn [the JRC's] findings and conclusions, and the facts uncovered during those prior investigations." *Id.* ¶ 17. Despite the broad language of paragraphs 16 and 17, plaintiff stated at oral argument that he makes no claim of a constitutional right of *access* to proceedings before the JRC, information gathered by the JRC, or decisions of the JRC. Transcript of May 8, 1991 Hearing (filed May 10, 1991) ("Tr.") at 34 ("Now, I know very well that I have not brought an access case. I am not talking about access because I haven't got a pray-

er to bring a case like that in federal court right now.").[2] Rather, plaintiff desires to *disclose* information he has obtained, either from his own interaction with the JRC or its staff or from others not affiliated with the JRC. Plaintiff has styled his case as a class action seeking a declaratory judgment as to the constitutionality of the statute on confidentiality and an injunction against its enforcement. Complaint ¶ 1.[3] Inasmuch as plaintiff does not purport to represent the members, staff, employees, or other persons acting as agents of the JRC in a JRC inquiry, the court does not address the constitutionality of confidentiality provisions imposed upon such persons.

## BACKGROUND

### A.

In Connecticut, state judges are appointed by the governor and confirmed by the General Assembly, or legislature, for terms of eight years. Amendments to Conn. Const. Art. XX, § 2. In order to continue in office for more than eight years, a sitting judge must be reappointed by the governor and reconfirmed by the General Assembly. Connecticut judges may also be impeached by the General Assembly, with impeachment by the House and trial by the Senate, Conn. Const. Art. IX, or removed by the governor upon the "address" of two thirds of each house of the General Assembly. Amendments to Conn. Const., Art. XXV.

Removal of judges under these provisions of the state constitution is neither quick nor easy. Waiting for the expiration of the term of a judge who ought not be reappointed may appear to be too long to wait. Impeachment is a cumbersome and time-consuming process. (Indeed, a search of historical sources has turned up no evi-

---

**1.** Reports in the Connecticut legal media indicate that the composition of the JRC has changed since this suit was filed.

**2.** In light of the liberality accorded to *pro se* pleadings, the Complaint shall be deemed amended to delete any claim of a right to access.

**3.** On January 27, 1992, plaintiff filed a motion for a temporary restraining order and for a preliminary injunction seeking to enjoin enforcement of Conn.Gen.Stat. § 51–51*l* (a), the

dence of judicial impeachments in Connecticut at all.[4]) In addition, it would be difficult for two-thirds of the members of each house of the General Assembly to ascertain facts justifying a formal address to the governor to remove a judge.

The difficulty entailed in removing judges is no cause for alarm, for security of tenure is closely related to the maintenance of judicial independence, a central concern of the framers of the Connecticut Constitution as well as the federal Constitution. In any event, many of the rare instances of judicial misconduct may be rectified by appeals to higher courts. At the same time, it is not surprising that, like almost all the other states,[5] Connecticut has sought to create an additional means of ensuring the continuing suitability of its sitting judges. This attempt began with an amendment in 1976 to the Connecticut Constitution, Amendments to Conn. Const. Art. XI. The amendment authorized the Connecticut Supreme Court to suspend or remove judges in a manner prescribed by law, and authorized the creation of a judicial review council with the power to suspend judges for periods of up to one year, or to refer cases to the Supreme Court for disposition.

### B.

Pursuant to this constitutional authorization, the General Assembly first enacted legislation creating the JRC in 1977. Since that time, a number of changes have been made in the statutes governing the JRC, which changes need not be reviewed here. It is sufficient to address the JRC as it

exists today. The JRC is composed of three judges of the Connecticut Superior Court elected by the judges of that court, three attorneys appointed by the governor and approved by the General Assembly, and five laypersons appointed by the governor and approved by the General Assembly. Conn.Gen.Stat. § 51–51$k$ (a). Other than the three members who are judges, no member of the JRC may hold an elective or appointed position in federal or state government, and no member may be a selectman or chief executive of any municipality, or belong to any national or state central committee of a political party or serve as chairperson of a political party. Conn.Gen. Stat. § 51–51$k$ (d).

The JRC is charged with determining whether a Connecticut judge or family support magistrate has engaged in conduct proscribed by Conn.Gen.Stat. § 51–51$i$, such as willful violations of the canons of judicial ethics, neglectful or incompetent performance of duties, and "temperament which adversely affects the orderly carriage of justice." The JRC must investigate all timely filed complaints against Connecticut judges or family support magistrates. Conn.Gen.Stat. §§ 51–51$l$ (a), 51–51$l$ (d). A judge or family support magistrate who is the object of a complaint must receive notice of and a copy of the complaint within five days of its receipt by the JRC. Conn.Gen.Stat. § 51–51$l$ (a). In conducting its investigations, the JRC may make use of the state police and other state agencies and has the power to compel testimony and the production of books and records by subpoena. Conn.Gen.Stat. § 51–51$o$.

confidentiality statute at issue. At the conclusion of a hearing on January 31, 1992, the motion for a temporary restraining order was denied.

**4.** *See, e.g.,* Dwight Loomis and J. Gilbert Calhoun, eds., *The Judicial and Civil History of Connecticut* at 175 (Boston History Co. 1895) ("Connecticut need never be ashamed of the character of her judges. Not one of them was

ever impeached. . . ."). *Cf. First Amendment Coalition v. Judicial Inquiry and Review Board,* 784 F.2d 467, 481 n. 4 (3d. Cir.1986) (Becker, J., concurring) ("No Pennsylvania judge has been impeached since the early nineteenth century.") (citation omitted).

**5.** *See Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 846–848, 98 S.Ct. 1535, 1545–46, 56 L.Ed.2d 1 (1978) (appendix listing state judicial review councils).

## C.

After a complaint has been filed, JRC proceedings have two distinct phases: a confidential preliminary investigation, and, if the JRC finds probable cause that judicial misconduct has occurred, an open hearing. In pertinent part, Conn.Gen.Stat. § 51–51*l* (a) provides that "[a]ny investigation to determine whether or not there is probable cause that conduct under section 51–51*i* has occurred shall be confidential and any individual called by the commission for the purpose of providing information shall not disclose his knowledge of such investigation to a third party...." As in the parallel federal system, the confidentiality of the investigation would appear to be required indefinitely. *See* 28 U.S.C. § 372(c).

There are two statutory exceptions to the rule of confidentiality. First, any investigation or proceeding shall not be confidential if the judge or family support magistrate who is the object of a complaint so requests. *See* Conn.Gen.Stat. § 51–51*l* (a); *see also* Conn.Gen.Stat. § 51–51*l* (f) (November, 1991 amendment). Second, the Legislative Program Review and Investigations Committee of the General Assembly may by majority vote obtain information concerning complaints, investigations, and disposition of complaints "provided no names or other identifying information shall be disclosed." Conn.Gen.Stat. 51–51*l* (e) (as amended November, 1991). The Connecticut confidentiality provisions are thus generally similar to those for review of complaints against federal judges. *See* 28 U.S.C. § 372(c)(14) (all papers, documents, and records of proceedings of an investigation are confidential, unless the subject of the investigation waives confidentiality). *See also* Rules 16 and 17, Rules of the Judicial Council of the Second Circuit Governing Complaints Against Judicial Officers Under 28 U.S.C. Section 372(c) (effective Jan. 2, 1992).

## D.

The second phase of proceedings by the JRC begins if the JRC finds probable cause

that conduct listed in Conn.Gen.Stat. § 51–51*i* has occurred. Following such a finding, the JRC must conduct an open hearing, and all proceedings are to be conducted on the record. Conn.Gen.Stat. § 51–51*l* (c). No later than fifteen days following the close of that hearing, the JRC must publish its findings and a memorandum stating the reasons for each finding. *Id.* As noted earlier, the JRC may suspend a judge for a period not exceeding one year, or recommend a complaint to the Connecticut Supreme Court for disposition. Decisions of the JRC may be appealed to the Connecticut Supreme Court by an aggrieved judge or family support magistrate. Conn.Gen.Stat. § 51–51*r*.

## E.

In the event that the JRC finds that conduct under Conn.Gen.Stat. § 51–51*i* has not occurred, but that a judge or family support magistrate "has acted in a manner which gives the appearance of impropriety or constitutes an unfavorable judicial or magisterial practice, the [JRC] may issue an admonishment to the judge or family support magistrate recommending a change in judicial or magisterial conduct or practice." Conn.Gen.Stat. § 51–51*l* (b). It is not known from the record how frequently the JRC issues such admonishments, nor does the current record disclose how frequently the JRC finds probable cause that judicial misconduct has occurred. Plaintiff alleges that during the four calendar years January 1, 1986, through December 31, 1989, the JRC received 470 complaints but held a public hearing on only one. Complaint ¶ 14. The Complaint further alleges that the JRC's procedures have "resulted in the suppression of evidence of substantial misconduct by judges," *id.*, and that the members of the JRC discourage attorneys from initiating complaints against Connecticut judges. *Id.* ¶ 15. Of course, even if it is true that the JRC rarely finds probable cause, that

fact, standing alone, hardly compels an adverse inference regarding the process of review; it could as easily reflect the Connecticut judiciary's generally high level of integrity.

### F.

It is not clear what penalties may attach to any violations of the statutory declaration that the preliminary investigation by JRC is to be kept confidential. One provision of the JRC statutes grants it "the same authority over witnesses as is provided in section 51–35 and [the JRC] may commit for contempt for a period no longer than thirty days." Conn.Gen.Stat. § 51–51o (a). However, by its terms Conn.Gen. Stat. § 51–35 addresses only a witness' refusal to appear and testify before a tribunal, not improper disclosure of confidential information. Plaintiff has drawn the court's attention to a legal brief filed with the Connecticut Freedom of Information Commission in which the JRC stated that failure to abide by the confidentiality provisions would result in "sanctions that the Council might impose if he did not abide by the statute." [6] Defendants have noted the uncertainty regarding whether punishment is statutorily prescribed for violations of the confidentiality provisions,[7] but do not dispute that the JRC filed the brief cited by plaintiff.

### G.

Pending before the court is defendants' Motion to Dismiss (filed Mar. 22, 1991). This motion seeks to have the Complaint dismissed as against all defendants for failure to state a claim, and as against defendant JRC on the ground that the Eleventh Amendment deprives the court of jurisdiction over a suit against this state entity. Following oral argument, further briefing by the parties and *amicus curiae* Connecticut Civil Liberties Union Foundation, and

amendment of the statute by the Connecticut General Assembly, the motion is now ripe for decision.

### DISCUSSION

### A.

 It is the duty of the federal courts to determine—if necessary, on their own initiative—whether matters pending before them constitute cases or controversies within the meaning of Article III of the Constitution. *See, e.g., Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). Defendants have noted the lack of clarity as to the JRC's possible power to punish breaches of the confidentiality rule.[8] This raises the issue of whether this lawsuit presents a genuine case or controversy for adjudication, although defendants have made no such argument. Based on the JRC's assertions of the state's (and indeed, its own) power to punish breaches of the confidentiality statute (in, for example, the brief filed with the state Freedom of Information Commission noted earlier), the court finds that the threat of punishment is sufficiently real to make this case justiciable.

### B.

 As an additional preliminary matter, the court grants the motion to dismiss as to defendant JRC. The JRC is a state entity clearly protected by the Eleventh Amendment's bar on suits against the states in federal court. *See, e.g., Florida Department of State v. Treasure Salvors, Inc.,* 458 U.S. 670, 684, 102 S.Ct. 3304, 3314, 73 L.Ed.2d 1057 (1982). However, as defendants concede, this dismissal has little, if any, substantive result here, since the suit may proceed against the remaining twelve individual defendants pursuant to the doctrine of *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

---

**6.** *See* Plaintiff's Reply to Defendants' June 14, 1991 Brief (filed July 29, 1991), Ex. E, at 7.

**7.** *See* Defendants' Memorandum in Support of Motion to Dismiss (filed Mar. 22, 1991) at 5.

**8.** *See* note 8.

## C.

The parties have narrowed the issues raised on the face of the complaint by statements and concessions in their briefs and at oral argument. Defendants concede, as they must, that under governing Supreme Court precedent the state may not prohibit plaintiff from disclosing any information he obtains about the JRC as a "stranger" to any investigation by the JRC—that is, information he obtains not by virtue of having filed a complaint or interacted with the JRC in connection with the investigation in question. *See Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978); Defendants' Memorandum in Support of Motion to Dismiss (filed Mar. 22, 1992) at 12–13. Defendants have also conceded that the JRC statute's confidentiality provisions violate the First Amendment to the extent that the statute prohibits a complainant's disclosure of the contents of his own complaint or his own testimony before the JRC, Tr. at 21, and have urged the court to adopt the holding of a leading decision in this area, *First Amendment Coalition v. Judicial Inquiry and Review Board*, 784 F.2d 467 (3d Cir.1986) (en banc) (Weis, J.). Tr. at 21, 23. Further, defendants have conceded that the case is governed in part by a decision of the Court of Appeals for the Fourth Circuit holding that the restrictions at issue may not be sustained unless narrowly tailored to serve compelling state interests. *See Baugh v. Judicial Inquiry and Review Commission*, 907 F.2d 440 (1990), *cited in* Reply Brief of Defendant [sic] (filed June 14, 1991) at 6.[9] As noted, plaintiff for his part stated that he does not seek access to proceedings before, decisions of, or information gathered by the JRC, despite the broad language of paragraphs 16 and 17 of the complaint. Tr. at 34. The only issues presented, therefore, are (1) the proper interpretation of the statute and (2) whether Connecticut may, consistently with the Constitution, forbid disclosure of the fact that ·a complainant or witness has filed a complaint with or given testimony or information to the JRC in an investigation prior to determination by the JRC as to the existence of probable cause.

## D.

What is the actual scope of Connecticut's confidentiality provision? As plaintiff notes, the Attorney General and the JRC do not appear to agree on the answer to this question. Plaintiff cites The "Third Report of the Judicial Review Council," dated September 24, 1990, which asserts that distributing copies of one's own complaint, disclosing the testimony one has given to the JRC, and disclosing the date and place of a JRC probable cause hearing all violate the confidentiality requirements of § 51–51*l*(a). *See* Plaintiff's Memorandum in Opposition to Motion to Dismiss (filed Apr. 10, 1991) at 2. The Attorney General maintains in his briefs, with no supporting argument, that nothing in the JRC statute prohibits plaintiff from disclosing the contents of his own complaint or his own testimony to the JRC. The Attorney General urges the court to construe the JRC statute to permit an individual to disclose the substance of his own complaint, the complaint itself, or his own testimony to the JRC, as opposed to what he learns by participating in a JRC proceeding. This construction, the Attorney General contends, would align

---

9. The decision of the Court of Appeals for the Fourth Circuit considered only the narrow question of the standard of review to be applied to Virginia's confidentiality statute prohibiting a complainant to the judicial review commission from making public his complaint and disclosing the action or lack of action taken by the commission. On remand, the district court in that case entered a consent decree declaring unconstitutional the Virginia statute insofar as it prohibited "complainants from disclosing the fact that a complaint has been filed with the Commission," and prohibited "complainants from disclosing the results of the Commission proceedings." *David P. Baugh v. Judicial Inquiry and Review Commission*, 1991 U.S.Dist.LEXIS 15810 (E.D.Va.) at *3. Defendants have not addressed the decree on remand, and accordingly are not deemed to have conceded its correctness.

the statute with constitutional requirements and make moot the constitutional challenge raised here.

There is nothing in the language of Conn.Gen.Stat. § 51–51*l* (a), however, to make it "readily susceptible" to the nuances proposed by the Attorney General. *Dorman v. Satti*, 862 F.2d 432, 435 (2d Cir.1988) (Connecticut Hunter Harassment Act not susceptible of interpretation sufficiently narrow to survive First Amendment scrutiny), *cert. denied*, 490 U.S. 1099, 109 S.Ct. 2450, 104 L.Ed.2d 1005 (1989). Precisely for this reason, certification to the Connecticut Supreme Court for an interpretation of the JRC confidentiality provisions, as requested by defendants, is not appropriate here. *Id.* at 435–36.

 Given the vagueness of the statute, and the dangers that vague prohibitions pose to freedom of expression, the court must interpret the confidentiality prohibition broadly, as broadly as an ordinary citizen might and, indeed, as broadly as has the JRC itself. When a state statute's " 'literal scope, unaided by a narrowing state court interpretation,' could reach such a fundamental right as freedom of speech sheltered by the first amendment, the void-for-vagueness doctrine 'demands a greater degree of specificity than in other contexts.' " *Dorman v. Satti*, 678 F.Supp. 375, 380 (D.Conn.1988) (quoting *Smith v. Goguen*, 415 U.S. 566, 572–73, 94 S.Ct. 1242, 1246–47, 39 L.Ed.2d 605 (1974)), *aff'd*, 862 F.2d 432 (2d Cir.), *cert. denied*, 490 U.S. 1099, 109 S.Ct. 2450, 104 L.Ed.2d 1005 (1989). Accordingly, the court reads Conn. Gen.Stat. § 51–51*l* (a) as prohibiting those disclosures plaintiff alleges in the Complaint that he desires to make—namely, disclosures of information regarding the charges he and others have filed with the JRC, as well as the findings and conclusions of the JRC he succeeds in obtaining.

### E.

As defendants have conceded, there is no question that the confidentiality provisions of the JRC statute are a content-based restriction on speech, and the restriction is justified by reference to the content of the speech at issue. *See* Reply Brief of Defendant [sic] (filed June 14, 1991) at 6, recognizing as governing *Baugh v. Judicial Inquiry and Review Commission*, 907 F.2d 440 (4th Cir.1990). Accordingly, the government interests invoked to justify a limitation on speech must be "necessary to serve a compelling state interest and ... narrowly drawn to achieve that end." *Boos v. Barry*, 485 U.S. 312, 321, 108 S.Ct. 1157, 1164, 99 L.Ed.2d 333 (1988); *Baugh*, 907 F.2d at 445; *cf. First Amendment Coalition*, 784 F.2d at 477 (confidentiality governing judicial review board proceedings a prior restraint on speech subject to a presumption of unconstitutionality). *See generally*, *Texas v. Johnson*, 491 U.S. 397, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989).

### F.

The JRC statute makes confidential only those proceedings held before a determination of probable cause has been made. Plaintiff conceded at oral argument that this distinction between information before and information after the JRC finds probable cause is "meaningful." Tr. at 30–31. Moreover, as plaintiff himself stated, Tr. at 33, there is "a very good analogy" between the proceedings of the JRC at the stage before probable cause is found and the proceedings of a grand jury. Both institutions are investigative bodies charged with determining whether there is probable cause to believe wrongdoing has occurred, and both necessarily operate with a degree of secrecy in order to facilitate investigations and protect the innocent. Indeed, in a recent decision examining the constitutionality of restrictions on the disclosure of testimony to a grand jury, the Supreme Court repeatedly cited as apposite its earlier analysis of confidential judicial review proceedings. *See Butterworth v. Smith*, 494 U.S. 624, 110 S.Ct. 1376, 1379–82, 108 L.Ed.2d 572 (1990), *citing Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978); *see*

also *First Amendment Coalition*, 784 F.2d at 473 (judicial review board with power only to recommend discipline has functions "similar to those of a grand jury").

In *Butterworth*, the Court considered the constitutionality of a Florida statute that prohibited grand jury witnesses from disclosing their knowledge of proceedings before the grand jury, including the contents and substance of their own testimony. The Court held that the statute violated the First Amendment insofar as it prohibited a witness from disclosing the contents of his own testimony to the grand jury after the grand jury had expired. In concurrence, Justice Scalia noted that the holding was limited to a witness' "First Amendment right to make a truthful statement of information he gathered on his own"; the opinion for the Court left unresolved, in Justice Scalia's view, whether the state could prohibit a grand jury witness from relating "not what he knew, but what it was he told the grand jury he knew." *Butterworth*, 110 S.Ct. at 1383 (Scalia, J., concurring). Furthermore, the Court expressly noted that its decision did not address that part of the Florida statute prohibiting disclosure by a witness of his experience of grand jury proceedings other than the contents of his own testimony. 110 S.Ct. at 1380 n. 2. Moreover, the opinion did not reach the question of whether disclosure of the contents of one's own testimony might be prohibited altogether while the grand jury remained in session. *Id.* at 1381.

Prior to the Supreme Court's decision in *Butterworth*, the Court of Appeals for the Third Circuit, sitting en banc, rendered what is perhaps the leading opinion on the mandates of the First Amendment as applied to judicial review councils like that of Connecticut. *See First Amendment Coalition v. Judicial Inquiry and Review Board, supra.* Anticipating *Butterworth*, the Court of Appeals for the Third Circuit held that witnesses before a Pennsylvania judicial review council could be prohibited from disclosing the testimony of others,

but could not be prohibited from disclosing "their own testimony" to the council. 784 F.2d at 467. (The court did not make clear whether it meant by this only what a witness knew or also what a witness *told* the council he knew.)

The *First Amendment Coalition* court drew extensively on the Supreme Court's opinion in *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978). In that case the Supreme Court considered the constitutionality of a Virginia statute making criminal the disclosure of the name of a judge under investigation by that state's Judicial Inquiry and Review Commission. The defendant was a newspaper that was not itself a party to proceedings before the Virginia commission but had obtained information about the proceedings and accurately reported it. In a narrowly written opinion by Chief Justice Burger, the Court held that the state's prohibition of disclosure by "strangers to the inquiry," 435 U.S. at 837, 98 S.Ct. at 1540, violated the First Amendment. The Court expressly noted that it did not have before it the case presented here—namely, the desire of a participant, such as a witness or a putative witness, to make a prohibited disclosure. *Id.* at 837 & n. 10, 98 S.Ct. at 1541 & n. 10. Nor did it address the situation where a party acquires information by illegal means. *Id.* at 837, 98 S.Ct. at 1540. Indeed, in a concurring opinion Justice Stewart stated that nothing in the Constitution prohibits the punishment of participants in a judicial review proceeding who violate rules of confidentiality. *Id.* at 849, 98 S.Ct. at 1546 (Stewart, J. concurring).

The interests served by Connecticut's distinction between proceedings before and after a determination as to probable cause has been made are apparent. Indeed, this very distinction is closely paralleled in the federal judiciary's own system for reviewing complaints of judicial misconduct. *See* 28 U.S.C. §§ 372(c)(8), 372(c)(14) (complaints against judicial officers confidential unless forwarded to the House of Representatives for possible impeachment pro-

ceedings). Given the confidentiality of the preliminary investigation, the JRC may dispose of meritless complaints—for example, complaints that on their face are utterly without basis or generated by apparent malice or bad faith—without lending any credibility to such complaints by appearing to conduct an extensive investigation. *Cf.* 28 U.S.C. § 372(c)(3) (chief judge of circuit may summarily dismiss patently frivolous complaints).

There is nothing especially surprising in the report of a distinguished commentator that "frivolous complaints make up between 88% and 99.5% of the total complaints filed" with each federal circuit's judicial council, which performs functions similar to those of the JRC. Harry T. Edwards, "Regulating Judicial Misconduct and Divining 'Good Behavior' for Federal Judges," 87 Mich.L.Rev. 765, 790 (1989). *See also* Stephen B. Burbank, "Procedural Rulemaking under the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980," 131 *U.Penn.L.Rev.* 283, 322 (1982) (most complaints in federal system are dismissed summarily by the chief judge of the circuit). In the United States Court of Appeals for the District of Columbia Circuit, for example, complainants have "almost universally" been "disappointed litigants or national organizations." Edwards, 87 Mich.L.Rev. at 789, *citing* Chief Judge Patricia M. Wald, Report on Experience under Judicial Conduct and Disability Act (unpublished memorandum dated September 25, 1987). Harassment would appear to be the norm, for "frequently the perennial litigators are also the perennial complainants." *Id.* at 790. The federal experience has been that the increased formality of the process by which complaints of alleged judicial misconduct are made following the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980 has "only encourage[d] litigants to make unfocused, nonlegally grounded charges." *Id.* at 789.

It is understandable, therefore, that Connecticut's judicial review process effectively takes account of the fact that many, if not most, of the complaints filed with the JRC and similar bodies are filed by embittered litigants or by social malcontents seeking to harass judges. As the Supreme Court observed with remarkable understatement in *Landmark*, "it can be assumed that some frivolous complaints will be made against judicial officers who rarely can satisfy all contending litigants." 435 U.S. at 835, 98 S.Ct. at 1539–40. *See also* Conn.Gen.Stat. § 51–51*g* (making of erroneous or unpopular decisions not grounds for judicial discipline).

Connecticut's judicial review process is clearly based on the understanding that open proceedings prior to a finding of probable cause would invite chronic, disgruntled litigants to use the JRC proceedings as a forum for collateral litigation of legal claims or theories rejected elsewhere or for the pursuit of vendettas against judges. Without confidentiality at the preliminary stage of judicial conduct review, Connecticut might have difficulty attracting and retaining high quality personnel for its judiciary if judges were to face continual abuse and harassment in JRC proceedings as a consequence of discharging their constitutional duties. Even more ominously, if exposed to complaints in open, preliminary proceedings, Connecticut judges might tend to be intimidated or unduly influenced by belligerent litigants who would be more likely than others to commence a retaliatory campaign of harassment of the judge before the JRC. The Connecticut General Assembly was evidently well aware of this concern when it created the JRC, for it stated in the preamble to the JRC statutes that "the continued independence of the judiciary is indispensable." Conn.Gen.Stat. § 51–51*g*.

The importance of judicial independence cannot be overemphasized, nor can the danger to that independence posed by retaliatory attacks on judges in open preliminary judicial conduct review proceedings. At the founding of the Republic, Alexander Hamilton noted that the

independence of judges is ... requisite to guard the Constitution and the rights of individuals ... from the effects of those ill humours, which the arts of designing men, or the influence of particular conjectures, sometimes disseminate among the people themselves....

*The Federalist* No. 78, at 527 (A. Hamilton) (J. Cooke, ed., 1961). *See generally* Irving R. Kaufman, "Chilling Judicial Independence," 88 *Yale L.J.* 681 (1979); Laurence H. Tribe, "Trying California's Judges on Television: Open Government or Judicial Intimidation?" 65 *A.B.A.J.* 1175 (1979). The need to preserve judicial independence by shielding judges from personal harassment and collateral attacks because of their rulings has long been recognized in the absolute immunity from liability accorded to judges for actions undertaken in their judicial capacities. *See, e.g., Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *see also In re Martin–Trigona,* 737 F.2d 1254, 1263 (2d Cir. 1984) (Winter, J.) (court may protect its jurisdiction by enjoining vexatious litigant from filing suits against court personnel). In the federal system, the Judicial Councils Reform and Judicial Conduct and Disability Act of 1980 recognizes the same problem by excluding from review complaints of judicial misconduct that "are directly related to the merits of a decision or procedural ruling." 28 U.S.C. § 372(c)(3).

A further point is that confidentiality encourages complaints, assistance in investigating complaints, and complete and truthful testimony. Attorneys and other parties who must frequently appear before the judiciary may make complaints or appear as witnesses in the knowledge that they would only be required to air their observations only when the JRC agrees that improper judicial conduct may well have occurred. *Landmark,* 435 U.S. at 835, 98 S.Ct. at 1539. Complainants may now make a confidential complaint that they know can result in corrective steps, a confidential admonishment, or even the quiet retirement of an offending judge.

By making preliminary investigations confidential, the JRC may also informally encourage infirm or incompetent judges to retire before the need for a hearing. *Id.* at 836, 98 S.Ct. at 1540. An aging or impaired judge whose faculties are diminished might prefer to end his career with dignity rather than be forced out of office following a public hearing. Indeed, if JRC proceedings were open before a finding of probable cause, judges of marginal suitability would be more likely to remain on the bench. Deprived of the opportunity to resign quietly, such judges might well feel compelled to attempt to vindicate themselves in prolonged hearings before the JRC or even through appeals to the Connecticut Supreme Court.

It bears recalling that many grounds for complaint may spring not from incorrigible defects in judicial character, but from individual idiosyncrasy, insensitivity to the feelings of others, or ignorance of proper procedures. Under a procedure that maintains confidentiality during a preliminary stage of investigation, attorneys and others may help monitor and improve judicial conduct without engendering the hostility of the judiciary as a whole, not to speak of the offending judges themselves.

It is true, of course, that the concern for the reputations of judges or courts is not, standing alone, sufficient to justify a restriction on speech. *Landmark,* 435 U.S. at 841–42, 98 S.Ct. at 1543. Judges are not, and must not be, immune from the "slings and arrows" of criticism in the press and elsewhere. However, Connecticut's concern is not merely with the reputation of its judges, but with their continuing suitability for the bench and with the independence of the judiciary as an institution. For the reasons noted above, the Connecticut legislature correctly concluded that confidentiality at the preliminary stage of investigations of judicial conduct, as in the case of grand juries, is vital for the success of this process. Such are the dangers of disclosure of all complaints from the outset, no matter how frivolous or insubstantial a complaint might be, that Connecticut might well choose to eliminate the JRC

entirely were such comprehensively open investigation to be required as a matter of constitutional law.

I conclude that Connecticut's interest in prohibiting disclosure of knowledge one has acquired by virtue of interacting with the JRC in an investigation or proceeding, before the JRC has made a determination as to probable cause, is sufficiently compelling to survive the strictest First Amendment scrutiny. *See Landmark,* 435 U.S. 829, 848, 98 S.Ct. 1535, 1546 (Stewart, J., concurring) ("There could hardly be a higher governmental interest than a State's interest in the quality of its judiciary"); *see generally First Amendment Coalition,* 784 F.2d at 479 (state interest "sufficiently strong" to support ban on disclosure of proceedings of judicial review board other than one's own testimony).

The state's interest in keeping confidential the *contents* or *substance* of an individual's own complaint or testimony, on the other hand, is much smaller and hence is not adequate to resist First Amendment challenge. This information is not the creation of the JRC's investigation, but pre-exists it. Indeed, a putative complainant under the existing statutory scheme may exercise the option of not filing a complaint with the JRC, but rather, simply air his grievances in public. What is more, because the JRC has the power to subpoena witnesses who have not themselves filed a complaint with the JRC, an individual who knew of judicial misconduct could effectively be silenced by the mere issuance of a JRC subpoena. As in the case of Florida's restriction on witnesses before the grand jury, "the potential for abuse ... is apparent." *Butterworth,* 110 S.Ct. at 1383. For these reasons, the Attorney General has conceded, Tr. at 21, and the court agrees, that prohibiting a witness from disclosing information already in his possession, as distinguished from any information gained by participating in JRC proceedings, would be unconstitutional.

Plaintiff argues that once he has the right to disclose the substance of his own testimony to the JRC, the state's interest in suppressing his disclosure of his incidental knowledge of JRC proceedings to which he has been a party is negligible. This is incorrect. In the course of a JRC investigation or proceeding, a member of the JRC or its staff might well advert to the testimony of other witnesses or the findings of its own investigations. A member of the JRC might respond in some way to the testimony so as to indicate a view on whether improper judicial conduct had occurred. To permit a participant in the process to disclose this information would effectively make the process open. For the reasons stated above, the state's interest in keeping the preliminary investigation confidential is compelling, and therefore sustains the prohibition on such disclosures against constitutional challenge. *Cf. United States v. Harrelson,* 713 F.2d 1114 (5th Cir.1983) (district court's local rules of civil procedure may constitutionally prohibit post-trial questioning of a juror as to the views of *other* jurors), *cert. denied,* 465 U.S. 1041, 104 S.Ct. 1318, 79 L.Ed.2d 714 (1984); Local Rule Civ.P. 12(f) (D.Conn. 1992) ("No juror shall respond to any inquiry as to the deliberations or vote of *the jury or of any other individual juror,* except on leave of Court...." [emphasis added]). Indeed, the state has a compelling interest in keeping confidential what the witness actually told the JRC, since this might reflect the course of questioning and the areas of inquiry stressed by the JRC investigation. The state may accordingly prohibit such disclosure. *Cf. Butterworth,* 110 S.Ct. at 1383 (Scalia, J., concurring).

Similarly, disclosure of the very fact that an individual had filed a complaint or had been contacted for an investigation might hamper an investigation or give undue credibility to a meritless complaint. In *Providence Journal Co. v. Newton,* 723 F.Supp. 846, 852 (D.R.I.1989), Judge Pettine asserted that there is "no principled way to distinguish the substance of an ethics complaint from the facts underlying it or to distinguish speech about such a

complaint from general public criticism of the accused official." However, the distinction is one subsequently drawn in an uncomplicated and persuasive way by Justice Scalia in *Butterworth:* like the fact that one has testified to a grand jury, the fact of the filing of a complaint, and the complainant's actual testimony to the JRC, are "in a way information of the *state's* own creation." 110 S.Ct. at 1383 (Scalia, J. concurring) (emphasis added). *Cf. Seattle Times Co. v. Rhinehart,* 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) (First Amendment does not foreclose court protective orders prohibiting disclosure of information that is gained through the litigation process).

In *Baugh v. Judicial Inquiry and Review Commission, supra,* the Court of Appeals for the Fourth Circuit had occasion to consider the standard of constitutional review applicable to a Virginia prohibition on a complainant's disclosure of his complaint and what action, if any, had been taken by the judicial review commission. The *Baugh* court correctly stated the standard of review as one of compelling state interests, but perceived the state's interest as limited to preventing adverse criticism of judges. 907 F.2d at 444. With respect, this aspect of an opinion of a court of appeals for a different circuit is neither controlling nor persuasive, for it fails to capture the panoply of state interests at issue. There can be no doubt that, if given the opportunity, mischievous litigants would file complaints with a judicial review commission, publicize the fact of the complaint, and then publicly criticize the commission for failing to investigate the complaint aggressively or to make the threshold finding of probable cause. In such circumstances, an accused judge and potential witnesses could fall under a media spotlight, thus hampering the commission's investigation as well as limiting the possibility of voluntary retirement or other corrective steps. The ready availability and attractiveness of this option to irresponsible complainants would doubtless greatly increase the number of meritless complaints, thus overburdening the commission and hindering investigations of potentially legitimate complaints.

In *Doe v. State of Florida Judicial Qualifications Commission,* 748 F.Supp. 1520 (S.D.Fla.1990), the court considered the question of whether the state could constitutionally prohibit a complainant from disclosing the mere fact that a complaint had been filed, and concluded that it could not. The court there set forth what it saw as the state's interests in prohibiting disclosure. These were: (1) protection of the reputations of individual judges as well as the judiciary as a whole, thereby preventing an undue loss of public confidence; (2) avoidance of the possibility that a complainant might use publication of the fact that a complaint had been filed as a "bully pulpit"; (3) facilitation of effective investigations; and (4) protection of the judges' right of privacy under the Florida constitution. *Id.* at 1526.

The discussion of the relevant state interests in *Doe* appears to be inadequate. For example, in its discussion of the "bully pulpit effect," the court contends that "[t]he danger that publication of filing of a complaint will necessarily result in overvaluation of its merits is largely illusory." *Id.* at 1527–28. Perhaps it is true that much of the public will not believe the allegations of the irresponsible complainant, but the "illusion" is enough to encourage that complainant to commence a campaign of harassment, as noted earlier. The *Doe* opinion nowhere addresses the results of such harassment: the loss of judicial independence and the overburdening of the review body with frivolous complaints.

The *Doe* opinion also underestimates the value of confidentiality in facilitating the investigative process. It is perhaps true that in some circumstances "the publication of the complaint may well have the effect of furthering the investigation by [the review body] by creating awareness of the complaint of third-party witnesses who may then come forward and testify," *id.* at 1528, but in most if not all cases the JRC and the complainant will already know the identity of potential witnesses. And the more common result of publication will be that witnesses otherwise willing to speak candidly will decline to do so, in the knowl-

edge that the media and others will pursue them to inquire whether they have in fact testified. Attorneys, court personnel, and others who are best situated to provide accurate and useful information would suffer the most from public knowledge that they had appeared before the JRC.

Lastly, the *Doe* court failed to take account of the interest in encouraging offending judges quietly to retire. This is surprising because this is precisely what occurred in the facts presented to the *Doe* court: a judge had treated a criminal defendant with AIDS in an unjustifiably discriminatory fashion, a complaint was filed with the Florida Judicial Qualifications Commission, and the judge resigned two months later. *Id.* at 1522.

It is noteworthy in this connection that the federal system of reviewing judicial misconduct could be construed to require confidentiality on the part of the complainant himself. *See* 28 U.S.C. § 372(c)(14) ("all papers, documents, and records of proceedings shall be confidential and shall not be disclosed by *any* person in any proceeding") (emphasis added); *but see* Burbank, 131 *U.Penn.L.Rev.* at 334 & n. 215 (noting uncertainty over whether confidentiality of disposition of complaint extends to complainants). Even if the federal statute does not prohibit a complainant from disclosing the fact that he has filed a complaint, quite possibly the state judicial system's interest in preventing disclosure is stronger than the federal system's interest. For state jurisdiction involves matters that excite human passions, such as family relations and violent crimes, that are relatively or completely absent from federal jurisdiction. Although the pathological litigant is not unknown to the federal courts, *see, e.g., In re Martin–Trigona, supra,* he is more frequently encountered in the substantially larger state court system.

Before the JRC has made a determination as to probable cause, the state's interests in confidentiality in preventing disclosure of the fact of the filing of the complaint, recognized in full array, are sufficiently compelling to make constitutionally permissible the prohibition on speech by a participant in the JRC regarding his participation in those proceedings (including the fact of having filed a complaint) and regarding the fact that he was a witness, as opposed to speech on "the information contained within the witness' testimony." *Butterworth,* 110 S.Ct. at 1383 (Scalia, J., concurring). Thus, under the rule announced here, a witness would be able to publish his view that "Judge Jones is abusive," but, consistently with the Constitution, could be forbidden from stating, before the JRC has made a finding on probable cause, "I was called before the Judicial Review Council and I told them Judge Jones is abusive" or "I have just filed a complaint about Judge Jones with the Judicial Review Council."

The state's interests in preventing disclosure of the fact that a complaint has been filed, and the fact that testimony has been given to the JRC, are strong, however, only when an investigation is still proceeding and before a probable cause determination has been made. If and when probable cause has been found, subsequent proceedings are by statute open. These proceedings will bring to light most if not all of the facts gathered in the preliminary investigation. *See Nichols v. Gamso,* 35 N.Y.2d 35, 358 N.Y.S.2d 712, 315 N.E.2d 770 (1974) (per curiam) (despite strong confidentiality provisions of judicial conduct review, ordering disclosure of preliminary proceedings related to charge sustained after disposition of complaint made public). And, as will be more often the case, after the JRC has found that there is no probable cause to find judicial misconduct, the possibility of undue media attention and the hampering of an investigation has passed. Absent the interests that justify the prohibition on speech while the preliminary investigation is under way, the First Amendment permits a complainant to disclose the fact that he had filed a complaint, a copy of the complaint itself, and the disposition of the complaint after the JRC has completed its preliminary investigation and rendered a decision whether there is probable cause to believe judicial misconduct occurred.

CONCLUSION

To summarize:

(1) The threat of punishment by the state in the event that plaintiff should violate the confidentiality provisions of Conn. Gen.Stat. § 51–51*l* (a) is sufficiently real to make plaintiff's suit a case or controversy under Article III of the Constitution.

(2) Plaintiff's suit in federal court against defendant Judicial Review Council, as opposed to its individual members, is barred by the Eleventh Amendment.

(3) Section 51–51*l* (a) of the Connecticut General Statutes is not susceptible to a construction meeting constitutional requirements of freedom of speech; nor is certification to the Connecticut Supreme Court for an interpretation of the statute appropriate in the circumstances.

(4) Under the First Amendment, the state may not at any time prohibit a witness or complainant from disclosing the information contained in his testimony or complaint to the Judicial Review Council.

(5) However, prior to a determination by the Judicial Review Council whether there is probable cause to believe that judicial misconduct has occurred, the state may constitutionally forbid disclosure of any information an individual obtains by virtue of his personal interaction with a Judicial Review Council inquiry.

(6) Similarly, prior to a determination as to probable cause, the state may prohibit disclosure by a witness or a complainant of the fact that he testified to, filed a complaint with, or otherwise participated in an investigation by the Judicial Review Council.

(7) After the Judicial Review Council has rendered a decision on whether there is probable cause to believe that judicial misconduct has occurred, the state may not constitutionally prohibit disclosure by a complainant or witness of his complaint, his participation in the preliminary investigation (including information he has acquired by virtue of his personal interaction with

the Judicial Review Council inquiry), or the disposition of the complaint.

Accordingly, for the reasons stated above, defendants' Motion to Dismiss (filed Mar. 19, 1991) is GRANTED in part and DENIED in part. This case is DISMISSED as against defendant Judicial Review Council only.

It is so ordered.